0228

James FRASIER and Nathalee Frasier, Appellants, v. Anthony Ross Mc-CLAIR, a minor fifteen (15) years of age, and Mary Frances McClair Frasier, his mother, Respondents.

(319 S. E. (2d) 350)

Court of Appeals

*Russell Brown,* Charleston, *for appellants.*

*Ernest G. DeVeaux, Jr.,* Charleston, *for respondents.*

*Professor Randall T. Chastain,* Columbia, *amicus curiae.*

Heard Feb. 23, 1984.

Decided Aug. 10, 1984.

SHAW, Judge:

This is an appeal from a family court order dismissing, with prejudice, appellants' request for adoption of the minor respondent, Anthony Ross McClair. We reverse.

The petition was procedurally proper and the action was duly brought on for hearing after the proper appointment of a Guardian ad Litem for the minor respondent.

In an equity action tried by a judge without a reference ■ the Supreme Court (also Appeals Court) has jurisdiction to find facts in accordance with its view of the preponderance of the evidence. *Townes Associates, Ltd. v. City of Greenville*, 266 S. C. 81, 221 S. E. (2d) 773 (1976).

The child's father is dead, and his mother lives in New York and sees him perhaps once a year. He has been reared since age three months by his step-grandparents, and, at the time of the hearing, was fifteen years old. The child wishes to be adopted by his step-grandparents. The mother consented to his adoption, and no issues are in the case regarding its validity or the nature of the information provided to her or to the child or to the proposed adoptive parents about the adoptive process.

The child's Guardian ad Litem recommended that the adoption be approved.

Nevertheless, the family court refused to decree the adoption, without relying on any cited authority, and without reference to Section 20-7-1760 of the 1976 Code, as amended, which provides in relevant part:

> The court may enter a final decree of adoption if satisfied that the adoption is for the best interest of the child.

The trial judge found that the proposed adoptive parents love the boy, and further found that he loved them. The court referred to the fact that the best interest of the child is "the guiding criterion for an adoption." The court went on to write that it was persuaded that there was no "higher purpose" which would serve the best interest of the child to be achieved by granting the adoption in question. The court apparently felt that the adoption was being sought solely so that the grandparents could secure "additional money from the taxpayers." This was to come about by the child's being eligible for social security benefits through the grandparents once adopted. Apparently the court felt this was the only reason the adoption was being sought.[1]

---

[1] This court is compelled, *sua sponte*, to point out that the child could have applied for social security benefits from his deceased natural father.

The order of the trial court is faulty on two grounds, either of which is sufficient to warrant reversal.

The trial court also speculated on "scenarios" in which the child would have less money as a result of there being social security money available to him than he would have had were conditions to have been different than they in fact are with regard to the biological parent. Of course, none of these speculative conditions in fact exists.

What the order of the trial court seems, then, to boil down to is a finding that there should be a public policy of the state forbidding adoptions if an effect of the adoption would be to enable the adopting parents to receive, for the use of the child adopted, governmental benefits to which they would otherwise not have been entitled on behalf of the child.

On the facts, we have a fifteen year old boy who is apparently reasonably well adjusted and reasonably happy, according to the only testimony in the record, who is living with his step-grandparents, who has no living father, and whose biological mother lives 1500 miles away from him and sees him perhaps once a year. He has been raised by the step-grandparents all his life, they love him, he loves them, and they now desire to formalize what has been an informal situation by adopting him. The biological mother consents, the court's own investigative officer (Guardian ad Litem) believes it to be in the best interest of the child, and the court refuses to grant the adoption because it believes that it might be possible that the remaining biological parent could achieve great wealth and the adoption would cut the boy off from the bounty that might come his way as a result of that wealth, and further believes that it might be possible for the child to secure disability support from the remaining biological parent in the event of an illness or something of the sort following the age of eighteen. The court acknowledged federal lifetime disability benefits would also be available, but apparently discounted them because they were "calculated under complex federal bureaucratic regulations without regard for South Carolina law."

Finally, of course, the court's order makes no mention of the testimony of the step-grandparents that they wanted to adopt him so he could be "stationary and for his name." The step-grandmother testified she wanted to get him a social security

card so he could get a job because she wanted him to work, and that was the same effective reason behind her wishing him to have his name changed so he could be, in effect, a member of the family community. The step-grandfather testified to like general effect. He acknowledged he would make application to the Social Security Administration "to get help for him [Anthony Ross]", but certainly made no testimony indicating the sole reason for the adoption was to get social security money. The step-grandparents acknowledged adoption would change Anthony Ross's name, he would rank equally with other children in inheritance, and he would become the nephew of their brothers and sisters, none of whom objected to having Anthony Ross become a member of the family.

From the foregoing, it can be seen the court really had no evidentiary basis upon which to conclude either (a) the adoption action was motivated by a bad motive (if securing social security benefits for the child be considered a bad motive); or (b) having social security benefits and the adoption would not be in the best interest of the minor child; or (c) the evidence did not preponderate in favor of granting the adoption on the best interest standard. There simply was no evidence contrary to the adoption's being in the best interest of the child. It was speculation on the part of the trial court the child might become better off financially someday if a mother with whom he had essentially no emotional contact over the years were somehow sometime to become very rich. The speculative nature of that conjecture is evident; its logical extension would make it very difficult for anyone ever to be adopted.

Second, the court's determination was controlled by an error of law. In South Carolina the adoption statute, now found at Sections 20-7-1650 through 20-7-1890 of the 1976 Code, as amended, must be interpreted exactly as written since adoption is a creature of statute in this state. Simply put, it contains no exceptions in the category either of who is eligible to adopt, or of children who may be adopted, for adoptions in which as a partial result of the assumption of family ties certain immediate cash payments from the government may be made available to one or more members of the newly formed family.

The essential principle here involved — a court is not free to vary the terms of a statute to suit its taste — is one which has

often been accepted by the Supreme Court of the State of South Carolina. *See Martin v. Ellisor*, 266 S. C. 377, 223 S. E. (2d) 415 (1976); *Elliott v. Sligh*, 233 S. C. 161, 103 S. E. (2d) 923 (1958); and *Gallman v. Springs Mills*, 201 S. C. 257, 22 S. E. (2d) 715 (1942), in which the court wrote:

> However much we might sympathize with the respondent, and regardless of what we may think the law should be in a case of the present character, it is not within our power to translate the sympathy and conviction into law. This is a strictly legislative function. (22 S. E. (2d) at 716).

In *Bedinger v. Graybill's Executor and Trustee*, 302 S. W. (2d) 594 (Ky. 1957), a man sought to circumvent certain provisions of his mother's Will by adopting his wife as his child and heir-at-law. The Kentucky statute stated "any adult person ... may petition the county court of the county of his legal domicile for leave to adopt a child or another adult...." (302 S. W. (2d) at 597).

The court wrote:

> It is important to note that the statute is unrestricted and unqualified. It authorizes any adult person to adopt any person of any age.
> It is the apparent absurdity of the adoption by a man of his wife that is startling. But may the court write an exception into the statute because of it?
> We do not know of a case of adoption so bizarre as this. (302 S. W. (2d) at 598).

He was permitted to adopt since the court could not read an exception into the statute which the legislature had not put there.

*See also, Collamore v. Learned*, 171 Mass. 99, 50 N. E. 518 (1898). In that case, a seventy year old man adopted three other adult men in their forties, thirties and twenties. The court, in an opinion by Mr. Justice Holmes, found the purpose of the adoptions was to eliminate any inducement some of those who otherwise would have been the testator's heirs might have to oppose his Will. The court wrote that was a perfectly reasonable motive, but added, "if it were bad, it would not affect the validity of the decree."

In other words, our statute admits of no inquiry by the court into the motives of the adopting parents or, for that matter, of the adopted person, other than as it relates to the best interest of the child. If it would be in the best interest of the child to be adopted, then the child is to be permitted to be adopted. Few things could be simpler.

Thus, to the extent the trial court believed it was proper to find a public policy contrary to the form of adoption involved here, it failed to document a source for that public policy in public documents, expressions of public officials, or any other traditional source of public policy. Indeed, it operated in the teeth of substantial policy to the contrary expressed by statute, court decision and rule. There was, and is, no such policy. Rather, the public policy of this state is well expressed in the following quotation from *Shehady v. Richards*, 83 N. M. 311, 491 P. (2d) 528 (1971):

The Adoptive Mother's Answer:

Not flesh of my flesh
Not bone of my bone
But still miraculously
My own.
Never forget
For a single minute—
You didn't grow under my heart
But in it.

The state supports adoption in all ways. No reason has been shown here to deny this adoption.

For the foregoing reasons, we reverse the order of the trial court. Upon receipt of the remittitur the family court shall enter the adoption decree effective as of the date of the original order in this matter.

Reversed and remanded.

SANDERS, C. J., and GOOLSBY, J., concur.